DOLAN ET AL. v. UNITED STATES.

BARRETT v. SAME.

Nos. 2,027, 2,028.

(Circuit Court of Appeals, Eight Circuit.   October 17, 1904).

1. INDICTMENTS—CONSOLIDATION—FEDERAL STATUTE.
    In Rev. St. § 1024 [U. S. Comp. St. 1901, p. 720], which authorizes the joinder in one indictment of charges,· and the consolidation of indict- ments, against the same person for the same act or transaction, or for two or more acts or transactions connected together, or of the same class of crimes or offenses "which may be properly joined," it is not intended by the latter phrase to limit the joinder or consolidation to charges which might have been joined at common law, but merely to vest the trial court with discretion to refuse to permit a joinder or consolidation where it would prevent a fair trial or be unjust to the defendant.

2. SAME.
    Separate indictments against the same persons under Rev. St. § 5427 [U. S. Comp. St. 1901, p. 3670], each charging them with having aided and abetted a different person in using a false certificate of citizenship as evidence of a· right to vote, the acts charged being the furnishing of such false certificates for the use of such persons by the defendants, all of which were made by them at the same time, charge acts or transac- tions connected together, and may properly be consolidated under Rev. St. § 1024 [U. S. Comp. St. 1901, p. 720].

3. ALIENS—CERTIFICATE OF CITIZENSHIP—OFFENSE OF USING FALSE CERTIFI- CATE.
    A certified copy of the record of a court showing the admission of an alien to citizenship constitutes a "certifi‥.te of citizenship," within the

meaning of Rev. St. §§ 5425, 5427 [U. S. Comp. St. 1901, pp. 3669, 3670], making it a crime to use or aid and abet another in using false certificates of citizenship for purposes therein specified.

4. SAME—FALSE CERTIFICATE.

A "false" certificate of citizenship, within the meaning of Rev. St. §§ 5425, 5427 [U. S. Comp. St. 1901, pp. 3669, 3670], which make it a criminal offense to knowingly use, or aid and abet another in using, "any false, forged, antedated or counterfeit certificate of citizenship," etc., is not limited to one which is forged, but includes one which is false in its recital of facts.

5. SAME—OFFENSE OF USING FALSE CERTIFICATE—RECITALS OF CERTIFICATE.

In Rev. St. § 5425 [U. S. Comp. St. 1901, p. 3669], making it a criminal offense to knowingly use any false or forged certificate of citizenship "purporting to have been issued under the provisions of any law of the United States relating to naturalization," the clause quoted refers to certificates which purport upon their face to have been issued after a compliance on the part of the alien named therein with the naturalization laws and as evidence of that fact, and a certificate to sustain an indictment based on such statute need not recite that it is issued under a law of the United States, there being, in fact, no statute authorizing or requiring the issuance of such certificates.

6. SAME—AIDING AND ABETTING—CONSTRUCTION OF STATUTE.

Rev. St. § 5427 [U. S. Comp. St. 1901, p. 3670], provides that "every person who knowingly and intentionally aids or abets any person in the commission of any felony denounced in the three preceding sections" shall be punished, etc. In the original statute said four sections were all embraced in one section, which expressly declared the offenses now contained in the three first sections to be felonies, and the part which now constitutes section 5427 read, "Any person who shall * * * aid and abet any person in the commission of any such felony," etc. In the revision such express declaration was omitted, and it has since been settled by decision that the offenses described in the first three sections are not felonies, but misdemeanors, under the common-law rule of construction applied to federal statutes, although the punishment prescribed is imprisonment in a penitentiary at hard labor, which, by the general understanding in this country, makes the offense a felony. *Held*, that such construction does not render section 5427 a nullity, but that the word "felony," as used therein, should be given its popular meaning, in order to give effect to the section in accordance with the manifest intention of Congress.

7. CRIMINAL LAW—SUFFICIENCY OF VERDICT.

A verdict in a criminal case which finds the defendants guilty upon certain counts of the indictments on which the trial was had, not guilty upon others, and which reports a disagreement as to the remaining counts, is entirely proper, and it is not error to receive such verdict and to enter judgment thereon as to the counts which were finally disposed of.

In Error to the District Court of the United States for the Eastern District of Missouri.

James L. Minnis and Chester H. Krum, for plaintiffs in error.

David P. Dyer and Bert D. Nortoni (Horace L. Dyer, on the brief), for defendant in error.

Before VAN DEVANTER and HOOK, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. This case, like the case of Levin v. United States, 128 Fed. 826, 63 C. C. A. 476, arises out of the extensive frauds which were practiced in the city of St. Louis in the

fall of 1902 in the naturalization of aliens. The evidence adduced upon the trial may be fairly summarized as follows: The defendant John P. Dolan, at the time of the commission of the crimes charged, was chairman of the Democratic City Committee of the city of St. Louis. The defendant Thomas E. Barrett was marshal of the St. Louis Court of Appeals, and was also an active politician of the same party as the defendant Dolan. The defendant Frank Garrett was a police officer of the same political persuasion, who lived and boarded with the defendant Dolan. Both Barrett and Garrett were Dolan's active friends and political supporters. At the time the offenses were committed there was about to be held in the city of St. Louis and in the state of Missouri the regular biennial election for city and state officers. The 14th day of October was the last day for registration of voters for that election. Before voters of foreign birth could be registered, they were required to present to the registration officers their certificates of citizenship and have the same noted on the registration books. The defendant John P. Dolan was the Democratic candidate for the office of constable—a very lucrative position in the city of St. Louis. John Barbaglia, who was jointly indicted with the defendants, but was dismissed and used as a government witness, was a Democratic precinct committeeman of the Ninth Precinct of the Twenty-Fourth Ward, of which ward the defendant John P. Dolan was ward committeeman. Barbaglia was an active, aggressive young Italian, and president of the North American Italian Club located in said precinct. He resided on what is known in the city as "Dago Hill," which was an extensive Italian settlement, and was a leader among his people. The St. Louis Court of Appeals held several sessions of court in the nighttime for the purpose of naturalizing aliens. Mr. John H. Murphy was its clerk, and the defendant Thomas E. Barrett was its marshal. Barrett's part in the naturalization business was to stand in front of the judges and take from the aliens who passed into the court and before the judges a certain slip of paper which the alien bore, and which was of the following purport: "Hon. John H. Murphy, Clerk of the St. Louis Court of Appeals: Please deliver to the party named certificate of citizenship." This slip of paper was signed by the proper member of the City or the Jefferson Democratic Club of St. Louis. Barrett would lay these slips on the desk of the clerk of the court. Some of the slips he wrote himself, and some of the certificates of citizenship he delivered to the applicants. The evidence shows that the naturalization of aliens was carried on in this court on the evenings of the 6th, 8th, and 10th of October, 1902, on an extensive scale. The aliens were collected in the corridors of the court and grouped according to their nationality—Russian Jews, Bohemians, Italians, etc. At the proper time each group would be moved forward into the courtroom and the oaths administered to the aliens. The same witnesses testified generally for the whole group. To prepare for this large volume of business, the clerk, previous to the session of the court, signed and affixed the seal of the court to a large number of blank

certificates, so that all he had to do was to fill in the names and the country of the applicant's nativity, and deliver the papers to the aliens or to some of the managers who had them in charge. He would afterwards make up his record from the slips. On the evening of the 10th of October he had a large number of these blanks thus signed and sealed which were unused. These he afterwards placed in a locker in his office, to which the defendant Barrett had free access as marshal of the court. The locker was never locked. Notwithstanding this facility of procedure and a remarkable diligence in collecting aliens, Barbaglia discovered, after the 10th of October, that there were a number of his countrymen who had not been brought before the court and for whom no papers had been obtained. He reported this fact to the defendant Dolan. Dolan stated to him that there would be no further sessions of the court for purposes of naturalization, but requested him to prepare a list of the Italians who had not received certificates. This Barbaglia did, and delivered to him a list of 13 names. Dolan delivered the list to the defendant Barrett, who thereupon purloined from the locker in the clerk's office a sufficient number of blank certificates to which the clerk's signature and seal had been affixed, and sent them by the defendant Garrett to Barbaglia. Barbaglia, under the supervision and by the direction of Garrett, filled up these blanks with the names of the Italians contained in the list above referred to, and delivered these papers to such Italians. The Italians used the same as evidence of their right to be registered as voters and to vote, and, in fact, registered and voted at the election which was held in November.

In the month of January, 1903, an investigation was instituted by the United States attorney and a grand jury concerning these naturalization frauds, and in connection therewith the United States attorney sent out numerous letters and subpœnas, calling to his office and before the grand jury the Italians to whom it was believed fraudulent certificates of citizenship had been issued. Among the persons so summoned was the defendant John Barbaglia. Immediately on receiving the letter he reported the fact to the defendants Dolan and Barrett. They advised him to get in at once the fraudulent certificates which had been issued to the Italians without any appearance in court. The main reason assigned for doing this was that these certificates had been filled out in Barbaglia's handwriting, and with a different colored ink from that which was used by the clerk of the court in filling out such papers, and there was fear that those facts would lead to a discovery. Upon Barbaglia's applying to his countrymen for a surrender of the papers, they refused to comply with his request, for the reason that they had registered and voted upon the papers, and they were fearful that they would be prosecuted for violation of the state election laws. Barbaglia reported their refusal to Dolan and Barrett. Thereupon Barrett procured a sufficient number of blank certificates of citizenship to duplicate these fraudulent ones, and filled them out to correspond with the fraudulent certificates, using the ink in the clerk's office, and forged the name of the clerk thereto,

and affixed the seal of the court. Armed with these, Barbaglia was able to persuade all his countrymen to surrender the original certificates and accept the forged ones instead, except two, namely, Pietro Venegoni and Franck Ferrario. These surrendered certificates were immediately destroyed by Barbaglia by direction of Dolan and Barrett.

John Barbaglia was indicted and convicted at the May term of the District Court at St. Louis for his part in these transactions, and sentenced to the penitentiary for five years. After his conviction he made a full confession, and by means thereof, and other evidence to the discovery of which his confession led, the defendants Barrett, Garrett, and Dolan were indicted.

Ten indictments were found and returned against all four of the defendants, based upon section 5427 of the Revised Statutes [U. S. Comp. St. 1901, p. 3670]. These indictments are identical in language, except that each one deals with a separate Italian whom it is charged that the defendants aided and abetted in violating the provisions of sections 5425 and 5426 [U. S. Comp. St. 1901, p. 3669]. Each of these indictments contains ten separate counts. They are all based upon the same transaction, but are varied in their language to fit different offenses under the sections last mentioned.

The first count charges that the Italian feloniously used, for the purpose of registration as a voter, and for the further purpose of making it appear that he had been lawfully naturalized and admitted to become a citizen of the United States, a false certificate of citizenship purporting to have been issued to him by the St. Louis Court of Appeals.

The second count charges that the Italian feloniously used, for the purposes aforesaid, a certificate of citizenship procured by fraud.

The third count charges that the Italian feloniously attempted to use, for the purposes aforesaid, a counterfeit certificate of citizenship.

The fourth count charges that the Italian feloniously attempted to use, for the purposes aforesaid, a forged certificate of citizenship.

The fifth count charges that the Italian was feloniously possessed, with the intent to feloniously use the same for the purposes aforesaid, of a false certificate of citizenship purporting to have been issued to him by the St. Louis Court of Appeals, and which said false certificate then and there purported to have been issued under the provisions of the law of the United States relating to naturalization.

The sixth count charges that the Italian feloniously used, for the purposes aforesaid, a forged certificate of citizenship, then and there known to him to be forged.

The seventh count charges the Italian with being possessed, with the intent on his part to unlawfully use the same for the purposes aforesaid, of a counterfeit certificate of citizenship.

The eighth count charges the Italian with having obtained, accepted, and received a certificate of citizenship procured by fraud,

and purporting to have been issued by the St. Louis Court of Appeals.

The ninth count charges that the Italian feloniously used, for the purpose of registration as aforesaid, a certificate of citizenship purporting to have been issued to him by the St. Louis Court of Appeals, showing that he had been admitted a citizen of the United States.

The tenth count charges that the Italian used, as evidence of his right to vote in the Ninth Precinct of the Twenty-Fourth Ward of the city of St. Louis, a certificate of citizenship which he then and there well knew was unlawfully made and issued, and it sets forth fully the facts showing that the certificate had been so unlawfully made and issued.

Each of the counts charges all of the defendants with aiding and abetting the Italian therein named in the commission of the above offenses. No attempt has been made to set forth the counts fully. The offenses are there alleged with great particularity, and a copy of the unlawful certificate of citizenship is set out in each of the counts. It will be observed that the counts all relate to the same transaction, and are simply framed to fit the various phrases of sections 5425 and 5426, so that no variance could be claimed, whatever view might be entertained of the evidence as adduced.

Against the objection of the defendants, the ten indictments were consolidated on motion of the government. At the conclusion of the evidence the court directed the jury to return a verdict of not guilty as to indictments numbered 4,912, 4,913, and 4,926, and as to all the counts in the other indictments except counts 5 and 9. The jury returned the following verdict:

"We, the jury in the above-entitled cause, find, under the instructions of the court, the defendants not guilty as charged in indictments No. 4,912, 4,913, and 4,926, and under like instructions we find the defendants not guilty as charged in the first, second, third, fourth, sixth, seventh, eighth, and tenth counts of each of the indictments numbered 4,910, 4,911, 4,914, 4,915, 4,916, 4,917, and 4,918.

"And we, the jury, find the defendants, namely, Thomas E. Barrett, John P. Dolan, and Frank Garrett, guilty as charged in each of the fifth counts of indictments numbered 4,915 and 4,918.

"And we, the jury, find the defendants, namely, Thomas E. Barrett and Frank Garrett, not guilty as charged in the ninth count of indictment No. 4,915.

"And we, the jury, find the defendants Thos. E. Barrett and Frank Garrett not guilty as charged in the ninth count of indictment No. 4,918.

"And we, the jury, report that we are unable to agree upon a verdict as to defendant Dolan on the ninth count of indictments numbered 4,915 and 4,918.

"And we, the jury, find the defendant Frank Garrett not guilty as charged in the fifth count of indictments numbered 4,910, 4,911, 4,914, 4,916, and 4,917.

"And we, the jury, report we are unable to agree upon a verdict as to defendants Thomas E. Barrett and John P. Dolan on the fifth count of indictments numbered 4,910, 4,911, 4,914, 4,916, and 4,917.

"[Signed] Joseph Weiler, Foreman."

It will be observed that the jury find all the defendants guilty as charged in the fifth count of indictments numbered 4,915 and 4,918. These counts relate to the original certificates filled out by Bar-

baglia, bearing the genuine signature of the clerk, together with the seal of the court, which were delivered to the Italians Pietro Venegoni and Franck Ferrario, and which they refused to surrender in exchange for the forged certificates prepared by the defendant Barrett. These counts severally charge that each of the Italians was knowingly and feloniously possessed, with the intent on his part to unlawfully use the same for the purpose of registering as a voter in the city of St. Louis, in the state of Missouri, of a false certificate of citizenship purporting to have been issued to him by the St. Louis Court of Appeals, and which said false certificate then and there purported to have been issued under the provisions of the law of the United States relating to naturalization. The counts conclude by charging the defendants with aiding and abetting the Italians in the commission of the foregoing offenses.

The first assignment of error challenges the order of the court consolidating the indictments. It would be difficult, however, to conceive of a case coming more properly within section 1024 of the Revised Statutes than the case under consideration. The indictments present charges against the defendants which appear to be for "the same act or transaction," or at least, "for two or more acts or transactions connected together," and certainly "for two or more acts or transactions of the same class of crimes or offenses." It is contended, however, by counsel for the defendants, that all these early provisions of section 1024 are limited and qualified by the clause "which may be properly joined," and that we must look to the common law to ascertain whether the joinder is proper or not. We do not accept this construction of the statute. Section 1024 [U. S. Comp. St. 1901, p. 720] was intended to abrogate the technical rules of the common law on the subject with which it deals. The clause "which may be properly joined" simply vests in the trial court a sound discretion in deciding whether a fair and impartial trial would be prevented by a joinder, notwithstanding the same would be permitted by one or more of the clauses mentioned in the first part of the section. There are often circumstances which would render a uniting of several offenses unjust to a defendant, and, as the old cases put it, "confound him in the making of his defense." Whenever such a situation arises, the trial court will protect the defendant's right to a fair trial.

"Whether the joinder was calculated to embarrass the prisoner, and, therefore, the offenses not 'properly joined,' within the meaning of the statute, was a question to be determined by the judge, in his discretion, on a motion to quash or to compel an election." United States v. Bennett, Fed. Cas. No. 14,572.

It is urged by counsel for the defendants that, "if the argument in support of the consolidation be observed to its ultimate consequence, you may consolidate two indictments for murder—one of A. and the other of B." And this is presented as a persuasive reason why the consolidation allowed was improper; but the Supreme Court, in the case of Poindexter v. United States, 151 U. S. 396, 14 Sup. Ct. 410, 38 L. Ed. 208, sanctioned the joining in one indict-

ment of two counts charging the murder of different persons. The opinion in that case amply justifies the practice of the trial court. See, also, Williams v. United States, 168 U. S. 382, 390, 18 Sup. Ct. 92, 42 L. Ed. 509.

A demurrer was interposed to the indictments, and to each count thereof, upon the ground that neither of said counts states facts sufficient to constitute an offense, because the paper set out therein as a "certificate of citizenship" shows upon its face that it is not such. The following is a copy of the certificate as it appears in each count of the ten indictments:

"United States of America.

"State of Missouri, City of St. Louis.

"In the St. Louis Court of Appeals. Oct. Term, 1902.

"Oct. 10. 1902.

"Pietro Venegoni a native of Italy who applies to be admitted a citizen of the United States, comes and proves to the satisfaction of the Court that at the time he arrived in the United States he had not attained his eighteenth year and that for the last two years it has been bona fide his intention to become a citizen of the United States ; that he has resided in the United States at least five years, and in the State of Missouri at least one year, immediately preceding this application, during which time he has conducted himself as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same ; and the Court, moreover, being satisfied that said applicant has taken the preparatory steps required by the laws of the United States, concerning the naturalization of foreigners, and he declaring here, in open Court, upon oath, that he will support the Constitution of the United States, and that he doth absolutely and entirely renounce and abjure all allegiance and fidelity to every foreign power, prince, potentate, state or sovereignty whatsoever, and particularly to the King of Italy of whom he is at present a subject, therefore the said Pietro Venegoni is admitted a Citizen of the United States.

"State of Missouri, City of St. Louis—ss. :

"I, John H. Murphy, clerk of the St. Louis Court of Appeals (said court being a court of record, having common-law jurisdiction, and a clerk and seal), certify the above to be a true transcript from the record, as the same now remains in my office.

"In testimony whereof, I hereunto set my hand and affix the seal of said court, at office, in the city of St. Louis, this Oct. 10, 1902.

"[Seal.] John H. Murphy, Clerk."

These documents are all the same, with the exception of the name of the Italian mentioned therein. It is contended by counsel for the defendants that these certified copies of the court record do not constitute a certificate of citizenship. The federal statutes nowhere define the term "certificate of citizenship," nor has there been any uniformity, in the practice of the various courts authorized by section 2165 to admit aliens to citizenship, as to the form of the document issued as evidence of such admission. Much light upon the meaning of the term may, however, be obtained from the acts of Congress and an early decision of the Supreme Court. The first statute which employs the phrase is the act of March 3, 1813 (2 Stat. 809). Section 2 of that act provides that it shall not be lawful to employ upon any public or private vessel of the United States any naturalized citizen of the United States, unless such

citizen shall produce "a certified copy of the act by which he shall have been naturalized, setting forth such naturalization and the time thereof." Section 13 provides that "if any person shall falsely make, forge or counterfeit, or cause or procure to be falsely made, forged or counterfeited any certificate or evidence of citizenship referred to in this act, he shall be punished," etc. This is the first penal statute dealing with the subject of documents evidencing the right of citizenship. It will be noticed that the first section quoted requires as evidence of that right "a certified copy of the act by which he shall have been naturalized," and the thirteenth section quoted refers to this document as a "certificate of citizenship." It is therefore manifest that Congress at that time entertained the view that a certified copy of the order or judgment of the court constituted a certificate of citizenship within the meaning of the criminal statute, which, in many of its provisions, is the same as the statutes upon which the indictments in this case were framed. The first case that came before the Supreme Court of the United States raising the question of the naturalization of an alien was Campbell v. Gordon, 6 Cranch, 176, 3 L. Ed. 190. The instrument which was there involved is set out in full in the argument of counsel for the appellant in the original reports of the court. It is simply a transcript of the journal of the court, verified as follows: "A copy. Teste: John C. Littlepage." This instrument is frequently referred to in the briefs of counsel and in the opinion of the court as a "certificate" or a "certificate of naturalization." It does not differ in form from the certificates here involved, except that 'the certificate of the clerk in the present case as to the genuineness of the copy is set forth with greater fullness. We, therefore, have a clear declaration, both by Congress and by the Supreme Court at an early day, that a certified copy of the record of the court, showing the admission of an alien to citizenship, constitutes a "certificate of citizenship." Other provisions of the statute point in the same direction. Subdivision 6 of section 2165 of the Revised Statutes [U. S. Comp. St. 1901, p. 1330], and section 2174 [U. S. Comp. St. 1901, p. 1334], both speak of "a certificate of his declaration of intention to become a citizen." This refers to the oath required by the first subdivision of section 2165, and consists of what is popularly known as "first papers." Inquiry among clerks of the federal courts discloses that it has never been the practice to issue as "first papers" anything but a certified copy of the oath mentioned in the first subdivision of section 2165. Such has been the practice since the passage of the first act authorizing the admission of aliens to citizenship. It has never been the custom of clerks to issue a certificate, under their hand and seal, purporting to state that the alien has made the preliminary declaration of intention. This having been the practice, it is manifest that Congress, in the statute of March 22, 1816 (being the sixth subdivision of section 2165, Rev. St.), and the act of June 7, 1872 (being section 2175, Rev. St.), considered such an exemplification of the record as a "certificate" of the alien's declaration of intention to become a citizen. Of course, if such an exemplifica-

tion constitutes, within the meaning of Congress, a "certificate" in the one case, it does in the other.

Webster defines a certificate as "a written testimony to the truth of any fact; a written declaration legally authenticated." Anderson's Law Dictionary defines it as "a writing giving assurance that a thing has or has not been done, that an act has or has not been performed." The certificates set forth in the indictments come clearly within these definitions. Popularly the term "certificate" would import a document in which the officer issuing the same purports to state on his own authority that certain acts have been done. No clerk of a court ought thus to speak as to judicial action unless authorized to do so by statute. A court can only speak by its records, and a clerk of court ought only to speak by a copy of such records. He ought not to attempt to declare his interpretation of their legal effect. If, therefore, any preference is to be given as between the practice of issuing an exemplification of the court records in the case of naturalization or a certificate wherein the clerk attempts to state the substance of such records, we should regard the former as the better practice. It is largely a matter of form. In the one case the officer recites the substance of the record in the body of his certificate; in the other he makes a full and accurate transcript of the record and verifies the same as a true copy by his official certification. There is no statute authorizing clerks of court to issue certificates of citizenship in any form. Their authority to do so arises from the fact that they have the custody of the records. It has been held that a certificate issued by the clerk which does not purport to be a transcript of the record is not proper evidence of naturalization. Charles Green's Son v. Salas (C. C.) 31 Fed. 106; Miller v. Reinhart, 18 Ga. 239. These decisions are unquestionably sound, for the clerk has no authority to certify the legal effect of his records, but can speak only by a transcript thereof. It has been repeatedly held that the proceeding whereby an alien is admitted to citizenship is a judicial proceeding, and that the order admitting him is a judgment. Spratt v. Spratt, 4 Pet. 393, 7 L. Ed. 897; Stark v. Chesapeake Ins. Co., 7 Cranch, 430, 3 L. Ed. 391; United States v. Gleason (C. C.) 78 Fed. 396. This being the character of the proceeding, and there being no statute authorizing the clerk to issue certificates of citizenship which shall simply declare his interpretation of the action of the court, it is manifest that the better practice would be for him to issue a certified copy of the record. At least, such a copy may very properly be defined as a certificate of citizenship.

In section 5426 [U. S. Comp. St. p. 3669] several terms are employed—"order," "certificate of citizenship," "certificate," "judgment," or "exemplification"—and it is urged by counsel that Congress thus clearly indicates that a "certificate of citizenship" is something different from an "exemplification" or certified copy of the record, and that the term "certificate of citizenship," as used in those statutes, is confined to a document which purports to certify the legal effect of judicial action in naturalization proceedings. We cannot accept this interpretation. Congress, in using the series of terms, was not attempting

to define their meaning or point out that the one excluded the other, but, out of an abundance of caution, used them all for the purpose of bringing within the prohibition of the statute any document "showing any person to be admitted to be a citizen." The various terms are used for the purpose of avoiding, and not for the purpose of creating, a limitation. In legislation nothing is more common than to use a generic term and follow it with special words, through apprehension that the statute may be confined to one of the meanings of the general term if that is used alone. In such a case, to limit the generic term to so much of its proper meaning as would be left after deducting the significance of the special terms would be to defeat the very purpose had in mind by the legislature in employing both. The language of Mr. Justice Story in United States v. Winn, 3 Sumn. 209, Fed Cas. No. 16,740, which has been so frequently quoted and approved, is especially appropriate to the present objection, and to several of the other questions raised in the present case:

"I agree to that rule [that penal statutes are to be strictly construed] in its true and sober sense, and that is that penal statutes are not to be enlarged by implication or extended to cases not obviously within their words and purport. But where the words are general and include various classes of persons, I know of no authority which would justify the court in restricting them to one class, or in giving them the narrowest interpretation, where the mischief to be redressed by the statute is equally applicable to all of them. And, where a word is used in a statute that has various known significances, I know of no rule that requires the court to adopt one in preference to another, simply because it is more restrained, if the objects of the statute equally apply to the largest and broadest sense of the word. In short, it appears to me that the proper course in all these cases is to search out and follow the true intent of the legislature, and to adopt that sense of the words which harmonizes best with the text, and promotes in the fullest manner the apparent policy and objects of the legislature."

In this case a criminal statute, speaking of the force of men upon a vessel, uses the words "master," "officers," and "crew," and counsel contended that the last word should be limited to the ordinary seamen, to the exclusion of the officers, but the court refused to adopt the limitation.

It is next urged that the indictment is fatally defective because it appears that the certificate of citizenship charged to be "false" is shown by other averments of the indictment to be false only in respect of the recitals of fact which it contains, whereas the statute uses the term "false" in the sense of forgery only. If the term is thus restricted in the statute, the objection is well taken, for the indictment, after setting forth the certificate of citizenship as above quoted and charging it to be false, proceeds to point out the particulars in which it is false by a traverse of each of the recitals of fact therein contained, as follows:

"That he, the said Pietro Venegoni, did not, on the 10th day of October, 1902, apply to the St. Louis Court of Appeals to be admitted a citizen of the United States, nor did he prove to the satisfaction of the court that at the time he arrived in the United States he had not attained his eighteenth year," etc., etc.

The charge of the indictment, therefore, plainly is that the certificate is false in its recitals and not in its execution. The statute makes it a crime to be knowingly possessed of "any false, forged, antedated

or counterfeit certificate of citizenship," etc. It is manifest that the term "false" cannot be restricted to the meaning of "forged" without rendering the term entirely nugatory, for the statute itself employs both the terms "forged" and "counterfeit," in addition to the term "false." It is the duty of the court to give some effect, if possible, to every word which the Legislature employs. There is nothing in the context, or the mischief to be corrected, or the consequences entailed by giving to every word of the statute its full force, to justify the striking out of one of its terms. A certificate which is false in respect of those facts which alone would justify its issuance is as much within the mischief of the statute as a forged or counterfeit instrument. But the question raised is no longer open to controversy. It was settled by the Supreme Court of the United States in U. S. v. Staats, 8 How. 41, 12 L. Ed. 979. That was a prosecution under the act of March 3, 1823, which is embodied in section 5421 of the Revised Statutes [U. S. Comp. St. 1901, p. 3667]. It renders penal the use of any "false, forged or counterfeit" writing in support of a claim against the government. The indictment charged that the defendant "did cause and procure to be transmitted and presented to the Commissioner of Pensions of the said United States of America the said false and untrue affidavit or writing as a true writing, well knowing the said affidavit or writing was false and untrue." The same contention was there urged as is now made, that the word "false" as contained in that statute was confined to a forged instrument. The court says:

"The only doubt that can be raised is whether the writing transmitted or presented to the commissioner in support of a claim for a pension should not, within the meaning of the statute, be an instrument forged or counterfeited in the technical sense of the term, and not one genuine as to the execution but false as it respects the facts embodied in it. * * * The case is within the mischief intended to be guarded against, and also within the words; and we think the considerations urged, founded upon the form and structure of the general provision, though plausible and calculated to excite doubt, not sufficient to take it out of them. A genuine instrument containing a false statement of facts, used in support of a claim, the party knowing it to be false, and using it with intent to defraud, presents a case not distinguishable in principle or in turpitude or in its mischievous effects from one in which every part of the instrument is fabricated; and, when the one is as fully within the words of the statute as the other, we may well suppose that it was intended to embrace it."

As the opinion explains, there is much in section 5421 which would justify the limiting of the term "false" as there employed, because all the clauses of the statute except the last show clearly that the term is restricted to forged and counterfeited documents. The language of that statute, however, which the court said rendered such an interpretation "plausible," is entirely absent from the statute which we are considering.

It is further objected that the statute requires the certificate of citizenship to be a document "purporting to have been issued under the provisions of any law of the United States relating to naturalization," and that the certificate in question does not satisfy this requirement. If the attention be fixed wholly upon the issuance of the certificate, the objection is no doubt sound, because there is in fact no law of the United States either requiring or authorizing the issuance of certificates

of citizenship. Such a refined interpretation of language, however, would defeat any penal statute, for it is always possible to find a meaning that will have that result. The very fact that there is no federal law authorizing the issuance of such documents demonstrates that Congress did not intend to restrict the statute in question to certificates so authorized. The clause quoted manifestly refers to certificates which purport upon their face to have been issued after a compliance on the part of the alien named therein with the naturalization laws, and as evidence of that fact. The certificate in question answers fully to that requirement. As part of this same objection, counsel points out that, in the case of papers issued under section 2167 to aliens who were minors when they arrived in the United States, there is no express provision requiring a record to be kept of the proceedings, as there is in the cases provided for by section 2165. The statute does require, however, that all these proceedings shall be had in courts of record, and no express statutory provision is necessary to authorize such courts to keep a record of their proceedings, nor does the absence of such authority affect in any way the evidential force of a transcript of such records.

Section 5427, under which the defendants are indicted, provides: "Every person who knowingly and intentionally aids or abets any person in the commission of any felony denounced in the three preceding sections," etc. It is now settled that the crimes created by the three preceding sections are not felonies, but misdemeanors. For this reason, counsel contends that the statute should be treated as a nullity, and the judgment reversed. For reasons which we have already explained, we cannot adopt a construction which thus defeats the manifest intention of the Legislature. The mistaken reference is easily explained. In the original statute sections 5424, 5425, 5426, and 5427 were all embraced in one section. It expressly declared the offenses now contained in the three first sections to be felonies. That part of the section which is now embraced in section 5427 then proceeds as follows: "Every person who shall knowingly and intentionally aid and abet any person in the commission of any such felony," etc. In the revision there is no language which expressly declares the offenses created by the three first sections to be felonies, and the compilers simply copied that part of the original section which is now embraced in section 5427 without taking account of this omission. Whether this was caused by an oversight or because the revisers failed to appreciate the technical meaning of the word "felony," no one can say. All the offenses created by the first three sections are punishable by imprisonment in the penitentiary at hard labor. By the general understanding in this country, a crime which may be thus punished is a felony, and it has required a great body of judicial opinions to settle finally that the term when used in the United States statutes must be confined to its common-law meaning, namely, an offense which is punishable by death or forfeiture of lands or goods. Considine v. United States, 112 Fed. 342, 50 C. C. A. 272; Bannon v. United States, 156 U. S. 464, 15 Sup. Ct. 467, 39 L. Ed. 494; United States v. Coppersmith (C. C.) 4 Fed. 198. All the cases, however, on this subject have arisen since the revision of the federal statutes in 1878. Neither meaning of a term which is thus

open to debate can be seized upon to destroy a statute whose real purpose is entirely plain. It is one of the elementary rules of statutory construction that, if a term has both a popular and a technical meaning, it will be assigned its popular meaning when that will give effect to the intention of the Legislature which the technical meaning would frustrate. Sutherland on Statutory Construction, § 250, and cases there cited. See, also, as declaring the proper rule for the interpretation of penal statutes, United States v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080.

Finally, it is contended that the court erred in receiving the verdict of the jury, which, though finding the defendants not guilty as to some of the counts of the indictments and guilty as to others, reported that the jury was unable to agree on the remaining counts. It is insisted that no verdict could properly be received which did not dispose of every count of the indictments by a finding either of guilty or not guilty. In the case of Selvester v. United States, 170 U. S. 262, 18 Sup. Ct. 580, 42 L. Ed. 1029, the court had this precise question under consideration, and held that such a verdict was entirely proper.

This disposes of all the errors assigned which we consider of sufficient importance to entitle them to a separate discussion. Numerous other minor matters are presented in the briefs, which have been carefully considered, but whose proper decision can in no way affect the conclusion which we have reached.

The judgment of the lower court is affirmed.